UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| BANCO SANTANDER (BRASIL), S.A., <br><br> Plaintiff, <br><br> v. <br><br> AMERICAN AIRLINES, INC., <br><br> Defendant. | No. 1:20-cv-03098-RPK-RER |

MEMORANDUM IN SUPPORT OF
DEFENDANT AMERICAN AIRLINES, INC.'S MOTION
TO DISMISS PLAINTIFF'S COMPLAINT

Date of Service: September 4, 2020

**TABLE OF CONTENTS**

**Page(s)**

INTRODUCTION ........................................................................................................................... 1
STATEMENT OF FACTS ............................................................................................................. 3
        A.       The AAdvantage Program Participation Agreement ............................................. 3
                1.       *The Parties' Contractual Obligations Under The Agreement* ................... 3
                2.       *The Force Majeure Provisions Relied On By Plaintiff* ............................. 4
                3.       *The Cessation Of Services And Other Termination Provisions* ................ 5
        B.       Plaintiff's Allegations ............................................................................................ 6
ARGUMENT .................................................................................................................................. 7
I.     Count I Fails To State A Claim.......................................................................................... 8
II.    Count II Fails To State A Claim. ..................................................................................... 13
CONCLUSION ............................................................................................................................. 15

i

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*407 E. 61st Garage Inc. v. Savoy Fifth Ave. Corp.*,
 23 N.Y.2d 275 (1968) .................................................................................................. 13

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) ..................................................................................................... 8

*Ashwood Capital, Inc. v. OTG Mgmt., Inc.*,
 99 A.D.3d 1 (2012) ...................................................................................................... 9

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. Envases Venezolanos, S.A.*,
 740 F. Supp. 260 (S.D.N.Y. 1990) ............................................................................. 13

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007) ..................................................................................................... 8

*Bierer v. Glaze, Inc.*,
 2006 WL 2882569 (E.D.N.Y. Oct. 6, 2006) .............................................................. 13

*Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*,
 41 N.Y.2d 397 (1977) ................................................................................................ 11

*Burke v. Steinmann*,
 2004 WL 1117891 (S.D.N.Y. May 18, 2004) ............................................................ 14

*Drummond v. Coal Sales, Inc. v. Kinder Morgan Operating LP "C"*,
 2017 WL 3149442 (N.D. Ala. July 25 2017) ............................................................. 15

*E.E.O.C. v. Port Auth. of N.Y. & N.J.*,
 768 F.3d 247 (2d Cir. 2014) ........................................................................................ 8

*FlightSafety Int'l, Inc. v. Flight Options, LLC*,
 418 F. Supp. 2d 103 (E.D.N.Y. 2005) ......................................................................... 8

*Gander Mountain Co. v. Islip U-Slip LCC*,
 923 F. Supp. 2d 351 (N.D.N.Y. 2013) ....................................................................... 14

*In re Fontana D'Oro Foods, Inc.*,
 122 Misc. 2d 1091 (N.Y. Sup. Ct. 1983) ................................................................... 13

*In re NYSE Specialists Sec. Litig.*,
 503 F.3d 89 (2d Cir. 2007) .......................................................................................... 8

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*John Hancock Mut. Life Ins. Co. v. Carolina Power & Light Co.*,
   717 F.2d 664 (2d Cir. 1983) .................................................................................................. 11

*Lynch v. City of New York*,
   952 F.3d 67 (2d Cir. 2020) ....................................................................................................... 7

*Soroof Trading Dev. Co. v. GE Fuel Cell Sys., LLC*,
   842 F. Supp. 2d 502 (S.D.N.Y. 2012) ..................................................................................... 8

*SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*,
   467 F.3d 107 (2d Cir. 2006) ................................................................................................... 11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ................................................................................................................. 3

*Two Farms Inc. v. Greenwich Ins. Co.*,
   628 F. App'x 802 (2d Cir. 2015) ........................................................................................... 12

*Urban Archeology Ltd. v. 207 E. 57th St. LLC*,
   891 N.Y.S.2d 63 (App. Div. 2009) ....................................................................................... 14

*W.W.W. Assoc. v. Giancontieri*,
   77 N.Y.2d 157 (1990) ........................................................................................................... 10

### Other Authorities

23 Williston on Contracts § 63.1 (4th ed. 2020) ......................................................................... 12

30 Williston on Contracts § 77:95 (4th ed. 2020) ....................................................................... 13

# INTRODUCTION

In 2016, Plaintiff Banco Santander (Brasil), S.A. ("Plaintiff") and Defendant American Airlines, Inc. ("American") entered into a 10-year agreement (the "Agreement") under which Plaintiff issues co-branded credit cards to qualified residents of Brazil, and American awards miles that can be redeemed for various rewards to those cardholders as they make purchases using their cards. Four years into the Agreement, Plaintiff filed this lawsuit seeking to terminate the Agreement because the pandemic COVID-19 resulted in American's temporary cessation of flight service to Brazil. But while the Agreement provides Plaintiff with termination rights under certain limited and specific circumstances, the Agreement's plain terms make clear that American's temporary cessation of service to Brazil is not one of them. The Complaint thus fails to state a claim and should be dismissed.

In Count I of its Complaint, Plaintiff seeks a declaratory judgment that it is entitled to terminate the Agreement based on the force majeure provisions set forth in Sections 20.4.5 and 23 of the Agreement. Specifically, Plaintiff contends that because American temporarily ceased flights to Brazil as a result of the COVID-19 pandemic and because the cessation of service lasted for longer than 90 days, it can terminate the Agreement pursuant to Section 20.4.5.

But the force majeure provisions in the Agreement protect from breach-of-contract liability a party who "delays or fails in its performance" under the Agreement because of a force majeure event (Compl. Ex. A § 23, ECF No. 22 ("Ex. A")), and only allow Plaintiff to terminate if a force majeure event causes American to "delay[] performance or fail[] to perform" a contractual obligation for longer than 90 days (*id.* § 20.4.5). Plaintiff's Count I fails as a matter of law because, as the plain language of the Agreement establishes, flying to Brazil without interruption is not one of American's obligations under the Agreement—so its temporary

cessation of service to Brazil is not a "failure to perform" any contractual obligation, and thus Section 20.4.5 does not allow for termination based on that temporary cessation.

That does not mean that the Agreement is agnostic about whether American flies to Brazil.  But Plaintiff's ability to terminate based on the existence and frequency of American's service to Brazil is governed by a different provision, entitled "Cessation of Services."  That provision allows Plaintiff to terminate (but not sue for breach) if American falls below a specified level of service between Brazil and the United States, as compared to certain other airlines, over the course of a full calendar year.  But that is the only contract provision governing and permitting termination of the Agreement based on American's level of flight service to Brazil, and Plaintiff does not (and cannot) allege that provision is satisfied here.

Plaintiff's alternative claim in Count II is that it should be excused from further performance under the frustration of purpose doctrine, but Count II fails to state a claim for similar reasons.  The frustration of purpose doctrine only applies in the limited circumstance when a wholly unforeseeable event destroys the entire purpose of the Agreement.  But the doctrine does *not* apply, as a matter of law, when the event that is supposedly unforeseen was itself considered in the contract.  That is the case here—the parties specifically contemplated the possibility of a significant reduction or cessation in American's flights between the United States and Brazil and included two separate provisions addressing that possibility: (i) the Cessation of Services provision discussed above, and (ii) a separate provision making clear that American makes no representations or warranties "with respect to flight activity, including any suspension, reduction or termination of flights by an [American] carrier" (*id.* § 6.8).  The fact that the Agreement expressly contemplates the possibility that American will suspend, reduce, or

terminate flights to Brazil categorically excludes a frustration of purpose argument based on the temporary cessation of service at issue here.

## STATEMENT OF FACTS

### A. The AAdvantage Program Participation Agreement

This case arises out of the December 9, 2016 AAdvantage Program Participation Agreement (the "Agreement") between American and Plaintiff. Under the 10-year Agreement, Plaintiff issues co-branded credit cards, jointly sponsored by American and Plaintiff, to qualified residents of Brazil. (Compl. ¶ 2; Ex. A § 1 (defining "Term").) Those cardholders are then enrolled in the AAdvantage Program (the "Program")—American's loyalty awards program. (Compl. ¶ 2.) As part of the Program, the cardholders earn reward miles when they make purchases using their credit cards and can then exchange those reward miles for American flights, upgrades, and other non-travel benefits or awards. (*Id.* ¶¶ 2, 12, 17; Ex. A § 1 (defining "AAdvantage Awards").)

*1.  The Parties' Contractual Obligations Under The Agreement*

The Agreement sets forth in detail the parties' respective contractual obligations.[1] Plaintiff is responsible for issuing credit cards to and establishing card accounts for Brazilian residents, as well as administering and managing the card accounts and awarding miles to the cardholders. (Ex. A §§ 3.1, 3.2, 4, 7.1, 9.) Irrespective of the number of miles the cardholders are awarded, Plaintiff must purchase from American a minimum quantity of miles per year at an established rate per mile. (*Id.* §§ 12, 13.)

---

[1] Because the Complaint refers repeatedly to, and attaches as an exhibit, the Agreement, it is "incorporated into the complaint by reference" and thus may be considered at the pleadings stage. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

3

American has numerous obligations under the Agreement.  (*See id.* § 6.)  For example, American must enroll the cardholders identified by Plaintiff in the Program (*id.* §§ 6.1, 6.2), post miles to the cardholders' accounts as Plaintiff awards them (*id.* § 10), grant special status to certain cardholders (*id.* § 15.5), field customer inquiries about the Program (*id.* §§ 7.2, 7.8), and provide advertising support for the Program (*see id.* §§ 6.5, 14).  The Agreement also requires American to sell the reward miles to Plaintiff at the established rates and consistent with the invoicing and other procedures outlined in the Agreement.  (*Id.* §§ 6.8, 11, 12, 13.)  Plaintiff has not alleged that American failed to comply with any of these obligations.  (*See generally* Compl.)

Crucially, however, the Agreement does not require American to continuously operate flights between the United States and Brazil.  No contract provision imposes any obligation on American to provide continuous service to Brazil.  To the contrary, the Agreement expressly states that "American shall not be deemed to have made any representation, warranty or covenant or have assumed any obligation . . . to [Plaintiff] under this Agreement with respect to flight activity, including any suspension, reduction or termination of flights by an [American] carrier."  (Ex. A § 6.8.)

### 2.  *The Force Majeure Provisions Relied On By Plaintiff*

Plaintiff's suit is based primarily on the Agreement's force majeure provisions—set forth in Sections 20.4.5 and 23 of the Agreement.  Normally, a party's failure to perform contractual obligations would result in liability for breach of contract.  But the Agreement's force majeure provisions alter the legal consequences of a failure to perform when that failure is caused by a Force Majeure Event—that is, "any act of God, war, strike, labor dispute, work stoppage, fire, act of government, act or attempted act of terrorism, or any other cause, whether similar or dissimilar, beyond the control of that [p]arty…."  (Ex. A § 23.)

4

Section 23—labeled "Force Majeure"—provides that "[n]o [p]arty shall be liable for delays or failure in its performance" under the Agreement when that delay or failure to perform results from a Force Majeure Event. Thus, while a failure to perform contractual obligations would normally be grounds for breach-of-contract liability, if the failure to perform is caused by a Force Majeure Event, the party who fails to perform is shielded from such liability.

The Agreement does not, however, absolve the party unable to perform from contractual consequences. If American fails to perform a contractual obligation because of a Force Majeure Event, Section 23 prevents Plaintiff from suing for breach, but Section 20.4.5 allows Plaintiff to terminate the Agreement if American's delay in performance or failure to perform exceeds 90 days. (*See id.* § 20.4.5 (allowing Plaintiff to terminate "[i]f pursuant to Section 23 American delays performance or fails to perform due to a Force Majeure Event" and the breach continues for 90 days).)[2]

These two provisions thus work together to ensure that while a party unable to perform because of a Force Majeure Event cannot be held liable for breach, the counterparty may terminate if the performance delay—i.e., the delay that would otherwise have constituted a breach of contract—continues for more than 90 days.

### 3. The Cessation Of Services And Other Termination Provisions

The Agreement also describes several other conditions under which one or both of the parties can terminate the Agreement before its 10-year expiration date. Most relevant here, Section 20.4.6 addresses flights to Brazil and authorizes Plaintiff to terminate the Agreement in the event of a "Cessation of Services" by American. (Ex. A § 20.4.6.) If during a full calendar

---

[2] Section 20.3.5 is a parallel provision allowing American to terminate if a Force Majeure Event prevents Plaintiff from performing a contractual obligation for more than 90 days. (*Id.* § 20.3.5.)

5

year American's Market Share—that is, available seats on American flights between the United States and Brazil as compared to available seats on competitor U.S.-based airlines' Brazil flights (*id.* § 1 (defining "Market Share"))—is reduced by 50 percent or more relative to 2016, Plaintiff may terminate the Agreement upon 120 days' notice. The Agreement also gives each party a right to terminate if the other party "breaches any material term, condition, representation, warranty or undertaking" of the Agreement and fails to cure that breach within 30 days. (*Id.* §§ 20.3.1, 20.4.1.)

### B. Plaintiff's Allegations

Almost four years after American and Plaintiff entered into the Agreement, on March 11, 2020, the World Health Organization declared COVID-19 a global pandemic. (Compl. ¶ 23.) Shortly after, on March 29, American temporarily ceased operating flights between the United States and Brazil. (*Id.* ¶¶ 29, 30.) It did not, however, invoke the force majeure provision in Section 23 or otherwise attempt to escape any of its obligations under the Agreement. (*See generally id.*)

Exactly three months later, on June 29, Plaintiff sent a letter notifying American of its intent to terminate the Agreement. (Compl. Ex. B.) Plaintiff argued that because American had temporarily ceased flights between the United States and Brazil, Plaintiff was entitled to terminate the Agreement under the force majeure termination clause found in Section 20.4.5. (*Id.* at 2.)

In response, American notified Plaintiff that it disputed Plaintiff's right to terminate.[3] The force majeure termination clause in Section 20.4.5, American explained, is not applicable here because American had not sought relief from any of its liabilities under the force majeure provision and had not otherwise delayed or failed to perform any of its contractual obligations. (Robertson Decl. Ex. 1 at 1-2.) The terms of the Agreement require American only to perform AAdvantage Program-related duties, not to operate flights between the United States and Brazil without interruption. (*Id.*) In fact, as American explained, the "Cessation of Services" provision in Section 20.4.6 expressly addresses the consequences of a cessation of flying, and sets out an entirely different set of termination requirements that indisputably are not satisfied here. (*Id.* at 2.)

On July 10, 2020, Plaintiff filed its Complaint in this action, seeking a declaratory judgment (i) that the Agreement was terminated on June 29 pursuant to Section 20.4.5, or (ii) in the alternative, that under the frustration of purpose doctrine, Plaintiff is excused from continuing to perform its contractual obligations.

For the reasons set forth below, this Court should dismiss the Complaint for failing to state a claim.

## **ARGUMENT**

To survive a motion to dismiss, a plaintiff must "support the viability of its claims by pleading sufficient nonconclusory factual matter to set forth a claim that is plausible on its face."

---

[3] Because the Complaint references American's letter response to Plaintiff's notice of intent to terminate (Compl. ¶ 35), the Court may consider it on a motion to dismiss without converting the motion into one for summary judgment. *See Lynch v. City of New York*, 952 F.3d 67, 79 (2d Cir. 2020) ("It is well established that a pleading is deemed to include any written instrument that is attached to it as an exhibit, or is incorporated in it by reference." (internal quotation marks and citations omitted)). This letter is attached as Exhibit 1 to the Declaration of Mark W. Robertson ("Robertson Decl.").

*E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Court must "accept all allegations in the complaint as true and draw all inferences in the light most favorable to the non-moving party's favor," but need not accord "[l]egal conclusions, deductions or opinions couched as factual allegations . . . a presumption of truthfulness." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (internal quotation marks omitted). And where, as here, the claims depend on interpretation of a contract, the Court "may dismiss the complaint where [the] contract[] [is] unambiguous and do[es] not support the plaintiff['s] claim." *Soroof Trading Dev. Co. v. GE Fuel Cell Sys., LLC*, 842 F. Supp. 2d 502, 509-10 (S.D.N.Y. 2012) (quoting *FlightSafety Int'l, Inc. v. Flight Options, LLC*, 418 F. Supp. 2d 103, 107 (E.D.N.Y. 2005)).

### I. <u>Count I Fails To State A Claim.</u>

The plain language of the Agreement establishes that the force majeure provisions on which Plaintiff relies do not apply here. Section 23 operates as a shield for the affected party from breach-of-contract liability. It provides that "[n]o [p]arty shall be liable" for a breach—that is, a "delay[] or failure in its performance" of its contractual obligations—if the breach is caused by a "Force Majeure Event" and the party provides "prompt written notice" of the Event. (Ex. A § 23.) Sections 20.3.5 and 20.4.5, in turn, provide an alternative remedy for the party whose performance is not affected by the Force Majeure Event. Although that party cannot sue for breach of contract, it is authorized under those sections to terminate the Agreement when "pursuant to Section 23" the other party "delays performance or fails to perform" its contractual obligations for 90 days "due to a Force Majeure Event." (*Id.* §§ 20.3.5, 20.4.5.) These provisions use parallel language and work in tandem—together, they ensure that a party will not

8

be held liable for breach when its failure to perform is outside of its control, but also allow the counterparty to walk away if the failure to perform lasts longer than 90 days.

Plaintiff contends that it is authorized to terminate the Agreement under Section 20.4.5 based on American's temporary cessation of flights to Brazil in response to the COVID-19 pandemic. Plaintiff's argument fails for the simple reason that flying to Brazil without interruption is not one of American's contractual obligations under the Agreement. Thus, American's temporary cessation of flying to Brazil is not "a delay[] or failure in its performance" under Section 23, and it is likewise not a "delay[] [in] performance or fail[ure] to perform" under Section 20.4.5.

The Agreement sets forth American's contractual obligations in detail. American is required to enroll cardholders in the AAdvantage Program, sell miles to Plaintiff at the established rates, invoice Plaintiff for purchased miles, post miles to the cardholder accounts, grant special status to certain cardholders, field customer inquiries about the AAdvantage Program, provide advertising support, and abide by intellectual property, data security, and confidentiality provisions. (*See, e.g.*, *id.* §§ 5-7, 10-12, 14-17.) Nowhere in the Agreement, however, did the parties agree that American must provide uninterrupted service between the United States and Brazil. To the contrary, the parties expressly agreed that "American shall not be deemed to have made any representation, warranty or covenant or have assumed any obligation . . . to [Plaintiff] under this Agreement with respect to flight activity, including any suspension, reduction, or termination of flights by an AA carrier." (*Id.* § 6.8.)

And Plaintiff cannot read into the Agreement a contractual obligation that the parties did not expressly provide for, particularly where, as here, the Agreement was "negotiated at arm's length by sophisticated, counseled businesspeople." *Ashwood Capital, Inc. v. OTG Mgmt., Inc.*,

9

99 A.D.3d 1, 7 (2012); *see also id.* ("According to well-established rules of contract interpretation, 'when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms.'" (quoting *W.W.W. Assoc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990)). Because continuously flying to Brazil is not one of American's obligations under the Agreement, American's temporary cessation of flights cannot count as a "failure to perform" within the meaning of Section 20.4.5.

That, of course, does not mean that the Agreement has nothing to say about American's flight service between the United States and Brazil. Plaintiff's Complaint does not mention it, but Section 20.4.6 of the Agreement—the very next section after the one Plaintiff invokes—authorizes Plaintiff to terminate (but not sue for breach of contract) if American substantially decreases flights to Brazil relative to 2016, when the parties negotiated the Agreement. That provision, aptly labeled "Cessation of Services," is tied to American's Market Share—a defined term in the Agreement that compares available seats on American flights between the United States and Brazil and available seats on competitor U.S.-based airlines' Brazil flights. (Ex. A § 20.4.6; *see also id.* § 1 (defining "Market Share").) The provision allows Plaintiff to terminate only when that Market Share is reduced by 50 percent *for a full calendar year* relative to 2016, and only upon 120 days' written notice. (*Id.* § 20.4.6.)

Plaintiff obviously does not allege that American triggered this provision because it has not been (and could not be) triggered here. Rather, Plaintiff has alleged only a 90-day suspension of flights to Brazil—as opposed to a full calendar year of reduced flight service—and has offered no comparison to the U.S.-Brazil flights of other U.S.-based airlines or to American's Market Share in 2016. But the fact that the parties negotiated and agreed upon a specific provision addressing precisely how and when termination based on flight cessation is allowed

10

(and another provision confirming American assumes no other obligations regarding flight activity (*id.* § 6.8)) confirms that the Agreement does not provide for termination based on flight cessation under the more general force majeure provision found in Section 20.4.5. *See John Hancock Mut. Life Ins. Co. v. Carolina Power & Light Co.*, 717 F.2d 664, 669 n.8 (2d Cir. 1983) ("New York law recognizes that definitive, particularized contract language takes precedence over expressions of intent that are general, summary, or preliminary.").

Moreover, even assuming for the sake of argument that Plaintiff's reading of the force majeure provisions could somehow be squared with the Agreement's plain language (and it cannot), it still would make no sense in light of the parties' behavior. *See SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 125 (2d Cir. 2006) (the reasonable expectations of the parties can be assessed "by looking to 'the objective manifestations of the intent of the parties as gathered by their expressed words and deeds.'" (quoting *Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*, 41 N.Y.2d 397, 399 (1977)). If American believed that the COVID-19 pandemic had caused it to fail to perform any of its contractual obligations, it would have invoked the force majeure clause in Section 23 to avoid liability. The entire point of that section is to protect a party that is unable to perform its contractual obligations due to a Force Majeure Event—the party need only give prompt notice of the event, and it will escape breach-of-contract liability for what would otherwise be a breach of the Agreement. There would have been no reason for American not to invoke Section 23—thereby exposing itself to breach-of-contract liability—if it was violating its contractual obligations.

Likewise, if Plaintiff believed that American was breaching its contractual obligations but had failed to invoke the force majeure provisions, it could have (and presumably would have) sued for breach of contract. Or if—despite believing that American was in breach—Plaintiff did

not want to sue, it could have terminated the Agreement earlier under Section 20.4.1, which authorizes Plaintiff to terminate the Agreement "[i]f American breaches any material term, condition, representation, warranty or undertaking" and fails to cure that breach after 30 days' written notice by Plaintiff. (Ex. A § 20.4.1.)  But Plaintiff did not pursue either of those options, because temporary cessation of service to Brazil is indisputably not a breach of the Agreement. (*See generally* Compl.)

Indeed, Plaintiff appears to have conceded that American's temporary cessation of flights to Brazil does not constitute a breach of the Agreement.  Response to Letter Mot. for Leave to File Mot. to Dismiss at 2, ECF No. 18 ("But [Plaintiff] is not seeking to hold American Airlines liable for a breach under Section 23.  Instead, [Plaintiff] seeks to terminate the Agreement irrespective of whether anything American Airlines did breached the Agreement . . . .").  But that concession ends the matter, because "failure to perform" under Section 20.4.5 can only mean conduct that would normally result in breach-of-contract liability.  After all, that is what "failure to perform" *means*—by definition, "a breach of contract is a *failure*, without legal excuse, *to perform* any promise that forms the whole or part of a contract," 23 Williston on Contracts § 63:1 (4th ed. 2020) (emphasis added), and the parties would not have used that familiar language to describe something other than a failure to perform contractual obligations that, but for the Force Majeure Event, would result in breach-of-contract liability.  That reading, moreover, is confirmed by the structure of the Agreement—Section 23 only applies to "delay[s] or failure[s] in performance" for which the party would otherwise be "liable," so Section 20.4.5's parallel language must mean the same thing.  *See Two Farms Inc. v. Greenwich Ins. Co.*, 628 F. App'x 802, 805 (2d Cir. 2015) ("Generally, 'a word used by the parties in one sense will be given the same meaning throughout the contract in the absence of countervailing reasons.'"

12

(quotation omitted)).  Plaintiff's concession that American has not breached the contract by temporarily suspending service to Brazil resolves the main issue in the case, and requires dismissal of Count I for failure to state a claim.

## II.     Count II Fails To State A Claim.

The plain language of the Agreement also requires dismissal of Plaintiff's alternative claim based on the frustration of purpose doctrine.

Frustration of purpose "refers to a situation where an unforeseen event has occurred, which, in the context of the entire transaction, destroys the underlying reasons for performing the contract, even though performance is possible, thus operating to discharge a party's duty of performance." *Bank of Am. Nat'l Tr. & Sav. Ass'n v. Envases Venezolanos, S.A.*, 740 F. Supp. 260, 266 (S.D.N.Y. 1990) (quoting *In re Fontana D'Oro Foods, Inc.*, 122 Misc. 2d 1091, 1096 (N.Y. Sup. Ct. 1983)).  There are "strict limits on the reach of [this] defense." *Id.*  A party may not "abrogate a contract unilaterally, merely upon a showing that it would be financially disadvantageous to perform it." *Id.* (quoting *407 E. 61st Garage Inc. v. Savoy Fifth Ave. Corp.*, 23 N.Y.2d 275, 282 (1968)); *see also Bierer v. Glaze, Inc.*, 2006 WL 2882569, at *7 (E.D.N.Y. Oct. 6, 2006) ("Under New York law, changes in market conditions or economic hardship do not excuse performance.").  Likewise, a party cannot claim frustration of purpose where the "the risk of th[e] unexpected occurrence" was "allocated to either party by agreement." 30 Williston on Contracts § 77:95 (4th ed. 2020); *see also Bank of Am. Nat'l Tr. & Sav. Ass'n*, 740 F. Supp. at 266 (frustration of purposes doctrine does not apply where the terms of the agreement explicitly take into account the possibility that the event would occur).  "[W]ere the rules otherwise, they would place in jeopardy all commercial contracts." *Bank of Am. Nat'l Tr. & Sav. Ass'n*, 740 F. Supp. at 266 (quoting *407 E. 61st Garage, Inc.*, 23 N.Y.2d at 281).

13

Far from "wholly unforeseeable," the parties specifically contemplated the possibility that American would reduce or cease flying between the United States and Brazil for some period of time and negotiated the consequences of such a cessation of services in the Agreement. Again, Section 20.4.6—the "Cessation of Services" termination clause—sets out a specific process by which Plaintiff can terminate the Agreement upon 120 days' notice if American's Market Share (as defined in the Agreement) is reduced by 50 percent or more over an entire calendar year relative to 2016. (Ex. A § 20.4.6.) The suggestion that the parties labeled a contract provision "Cessation of Services" without contemplating the possibility that services would cease is implausible on its face. Section 6.8, moreover, confirms that point. That provision says that "American shall not be deemed to have made any representation, warranty or covenant . . . with respect to flight activity, including any suspension, reduction or termination of flights by an AA Carrier." (*Id.* § 6.8.) Parties that agreed to a provision about the consequences of "suspension, reduction or termination" of flight activity obviously contemplated the possibility that services would be suspended, reduced, or even terminated.

Those provisions of the Agreement—establishing on their face that the parties contemplated the risk of American ceasing flight service and deliberately assigning the risk of that occurrence to Plaintiff—warrant dismissal of Plaintiff's frustration of purpose claim as a matter of law. Other courts have dismissed similar claims on Rule 12(b) motions. *See, e.g.*, *Gander Mountain Co. v. Islip U-Slip LCC*, 923 F. Supp. 2d 351, 361-63 (N.D.N.Y. 2013) (dismissing frustration of purpose claim where agreement explicitly contemplated the contingency and allocated risks between the parties), *aff'd on other grounds*, 561 F. App'x 48 (2d Cir. 2014); *Burke v. Steinmann*, 2004 WL 1117891, at *9 (S.D.N.Y. May 18, 2004) (dismissing defendant's counterclaim for frustration of purpose); *Urban Archeology Ltd. v. 207*

14

*E. 57th St. LLC*, 891 N.Y.S.2d 63 (App. Div. 2009). For instance, in *Drummond v. Coal Sales, Inc. v. Kinder Morgan Operating LP "C"*, 2017 WL 3149442 (N.D. Ala. July 25 2017), the court, applying New York law, explicitly rejected the plaintiff's argument that its frustration of purpose claim could not be decided on motion to dismiss. *See id.* at \*4. The court concluded that the event at issue there—a regulatory change—was foreseeable as a matter of law because the agreement "contemplate[d] the potential for regulatory agencies to impose new regulations affecting the parties' contract expectations" and "allocate[d] the [associated] risks" to the plaintiff. *Id.* at \*5. Here, as in *Drummond*, the parties explicitly contemplated the possibility that American would reduce, suspend, or terminate its flight service and they assigned the risk associated with that possibility to Plaintiff. There is thus no basis for applying the frustration of purpose doctrine, and Count II should be dismissed for failure to state a claim.

## CONCLUSION

For these reasons, Plaintiff's Complaint should be dismissed in its entirety with prejudice.

Dated:  September 4, 2020

Respectfully submitted,

/s/ *Mark W. Robertson*

Mark W. Robertson
mrobertson@omm.com
Anton Metlitsky
ametlitsky@omm.com
O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, NY 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

Anna Mohan (*pro hac vice*)
amohan@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC  20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

**Attorneys for American Airlines, Inc.**