**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BANCO SANTANDER (BRASIL), S.A.,<br><br>          Plaintiff,<br><br>     v.<br><br>AMERICAN AIRLINES, INC.,<br><br>          Defendant. | No. 1:20-cv-03098-RPK-RER |

**REPLY IN SUPPORT OF
DEFENDANT AMERICAN AIRLINES, INC.'S MOTION
TO DISMISS PLAINTIFF'S COMPLAINT**

Date of Service:  October 9, 2020

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ........ 1
ARGUMENT ........ 1
I. Count I Fails To State A Claim........ 1
A. Sections 6.8 And 20.4.6 Make Clear That American Has No Obligation—Express Or Implied—To Fly Continuously To Brazil........ 2
B. Plaintiff's Proposed Reading Would Make The Agreement Indaministrable. ........ 5
II. Count II Fails To State A Claim. ........ 6
A. The Parties Expressly Contemplated The Possibility That American Would Reduce Or Terminate Flights To Brazil........ 6
B. The Fact That The Parties Did Not Specifically Contemplate The Pandemic Does Not Warrant Application Of The Frustration Of Purpose Doctrine........ 8
C. Predictions About Future Flight Service Do Not Justify Application Of The Frustration Of Purpose Doctrine........ 10
CONCLUSION........ 10

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*2138747 Ontario, Inc. v. Samsung C&T Corp.*,
 31 N.Y.3d 372 (2018) .................................................................................................. 5

*407 E. 61st Garage Inc. v. Savoy Fifth Ave. Corp.*,
 23 N.Y.2d 275 (1968) ................................................................................................ 10

*A+E Television Networks v. Wish Factory Inc.*,
 2016 WL 8136110 (S.D.N.Y. Mar. 11, 2016) ............................................................. 8

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. Envases Venezolanos, S.A.*,
 740 F. Supp. 260 (S.D.N.Y. 1990) ......................................................................... 7, 10

*Bierer v. Glaze, Inc.*,
 2006 WL 2882569 (E.D.N.Y. Oct. 6, 2006) .............................................................. 10

*Goddard v. Ishikawajima-Harima Heavy Indus. Co.*,
 29 A.D.2d 754 (1st Dep't 1968) ................................................................................... 9

*Health-Chem Corp. v. Baker*,
 737 F. Supp. 770 (S.D.N.Y. 1990) ............................................................................. 10

*Jack Kelly Partners LLC v. Zegelstein*,
 140 A.D.3d 79 (1st Dep't 2016) ............................................................................. 9, 10

*Kolodin v. Valenti*,
 115 A.D.3d 197 (1st Dep't 2014) ................................................................................. 9

*Marks Realty Co. v. Hotel Hermitage Co.*,
 170 A.D. 484 (2d Dep't 1915) ...................................................................................... 9

*Parkhurst v. United Rentals Aerial Equip., Inc.*,
 75 A.D.3d 702 (3d Dep't 2010) .................................................................................... 3

*Raner v. Goldberg*,
 244 N.Y. 438 (1927) .................................................................................................... 9

*United States v. Gen. Douglas McArthur Senior Vill., Inc.*,
 508 F.2d 377 (2d Cir. 1974) ......................................................................................... 6

*United States v. Winstar Corp.*,
 518 U.S. 839 (1996) ..................................................................................................... 7

*Warner v. Kaplan*,
 71 A.D.3d 1 (1st Dep't 2009) ....................................................................................... 7

**Other Authorities**

11 Williston on Contracts § 31:7 (4th ed. 2020) .......................................................................... 5

David Shepardson & Tracy Rucinski, *American Airlines Soars 41% As Plan To Add July Flights Sparks Relief Rally*, Reuters (June 4, 2020) ............................................................... 10

**INTRODUCTION**

In Count I, Plaintiff alleges a termination right under the force majeure termination provision (Section 20.4.5) because American ceased flying to Brazil for more than 90 days—but the plain terms of the Agreement establish that continuously flying to Brazil is not an obligation of the Agreement that American has breached.  That plain language is fatal to Count I.  It is true, as Plaintiff argues at length, that American is an airline, so an underlying assumption of the Agreement is that American is in the business of flying airplanes.  But Plaintiff cannot create out of whole cloth a contractual obligation to operate continuous flights based on that background assumption when the Agreement expressly *disclaims* any such obligation (Section 6.8) and provides Plaintiff a termination remedy only if American's cessation of service satisfies certain criteria that are indisputably not satisfied here (Section 20.4.6).  Count I fails as a matter of law.

These same provisions also doom Count II, which alleges frustration of purpose. Sections 6.8 and 20.4.6 make clear that the parties foresaw the possibility that American would halt flights to Brazil, and allocated that risk under the Agreement.  Established precedent precludes applying the frustration of purpose doctrine in those circumstances.  It is true that no one foresaw the COVID-19 pandemic, but that is irrelevant.  The parties indisputably foresaw the possibility of American's cessation of service, which dooms Count II as a matter of law.

**ARGUMENT**

**I.      Count I Fails To State A Claim.**

As American detailed in its motion to dismiss, the plain language of the Agreement's force majeure provisions (in Sections 20.4.5 and 23) establish that those provisions work together to dictate what happens if a force majeure event causes American to "fail[] to perform" its contractual obligations and thus breach the Agreement.  (Def. Mot. to Dismiss ("Mot.") (ECF No. 23) 4-5, 8-9.)  Under Section 23, American will not be held liable for the breach (if it

1

provides adequate notice of the force majeure event).  (Compl. (ECF No. 22) Ex. A § 23.)  But Section 20.4.5 ensures that Plaintiff is not without recourse—if American's breach lasts for longer than 90 days, Plaintiff can terminate the Agreement.  (*Id.* § 20.4.5.)  American also detailed why, based on the plain language of those provisions, they do not apply here:  American has no contractual obligation to fly continuously to Brazil and so did not "fail to perform" its obligations (i.e., it did not breach the Agreement), as required to trigger Section 20.4.5, when it temporarily ceased flying to Brazil in response to the COVID-19 pandemic.  (Mot. 9-10.)  Each of Plaintiff's responses lacks merit.

A. **Sections 6.8 And 20.4.6 Make Clear That American Has No Obligation— Express Or Implied—To Fly Continuously To Brazil.**

Plaintiff's opposition does not contend that American breached an express contractual obligation.  Nor could it, because there is no such provision.  Plaintiff points instead to miscellaneous provisions of the Agreement that, according to Plaintiff, show that "the parties intended and agreed that American is obligated to fly" to Brazil.  (Opp. to Def. Mot. to Dismiss the Compl. ("Opp.") (ECF No. 26) 10.)  But these provisions simply show that the parties recognized that American is an airline and assumed it would continue to operate as an airline during the Agreement.  (*See, e.g.*, Compl. Ex. A §§ 5.2, 17.1, 18.1.1 (American is an "airline"); *id.* § 17.1 (American's data includes flight itineraries, ticket information, and passenger names); *id.* § 19.5 (American is subject to the Warsaw Convention); *id.* § 20.3.3 (American is regulated by the U.S. Department of Transportation).)[1]  That unremarkable proposition—that American is

---

[1] Plaintiff also cites Section 23's reference to "hijacking" in its definition of a force majeure event and suggests that hijacking does not make sense as a force majeure event unless American has an obligation to fly continuously to Brazil.  (Opp. 13.)  But Section 23's hijacking reference ties directly to—and indeed, uses the exact same language as—§ 14.3 of the Agreement, which allows American temporarily to suspend the marketing it would otherwise be contractually required to publish upon the occurrence of a "hijacking or attempted hijacking."  (*Compare*

2

an airline and operates flights as part of its business—is not what matters here. The question is whether the Agreement *obligates* American to fly continuously to Brazil, rather than simply incorporating as a background assumption that an airline's business is to fly airplanes. The answer to that question is no, under the plain language of the Agreement.

Most obviously, there is Section 6.8, which expressly states that American "shall not be deemed to have made any representation, warranty, or covenant or have assumed any obligation . . . with respect to flight activity, including any suspension, reduction or termination of flights by an AA Carrier." (*Id.* § 6.8.) The parties thus made clear that American has no contractual obligation to operate a specific number or frequency of flights to Brazil and does not breach or "fail to perform" the Agreement if it limits, reduces, or temporarily suspends its flight service. According to Plaintiff, all Section 6.8 does is ensure that—so long as American continuously operates flights to Brazil—it has the discretion to change its mix of flight routes. (Opp. 13-14.) But nothing in that provision limits its application to changing "flight routes" or eliminating "particular flights." Instead, Section 6.8 states unequivocally that American has not "assumed *any* obligation . . . to [Plaintiff] . . . under this Agreement with respect to flight activity." (Compl. Ex. A § 6.8 (emphasis added).) *See Parkhurst v. United Rentals Aerial Equip., Inc.*, 75 A.D.3d 702, 704 (3d Dep't 2010) ("The word 'any' has an expansive meaning

---

Compl. Ex. A § 23 (defining "Force Majeure Event" to include "without limitation, any incident, accident or hijacking or attempted hijacking involving any aircraft of American or any of its Affiliates or any other airline carrier"), *with id.* § 14.3 (allowing American to suspend marketing and advertising obligations "[u]pon the occurrence of . . . without limitation, any incident, accident, or hijacking or attempted hijacking, involving any aircraft of (i) American or any of its Affiliates, or (ii) any other airline carrier").) If there is a hijacking, then, these two provisions allow American temporarily to suspend its marketing and advertising, while affording Plaintiff the right to terminate the Agreement if that suspension lasts for longer than 90 days.

3

and should be broadly construed." (quotations and alterations omitted), *aff'd*, 17 N.Y.3d 908 (2011). Plaintiff cannot square its reading with the plain text of the Agreement.

That does not mean, contrary to Plaintiff's suggestion (Opp. 14), that American has "*carte blanche* to cease flying altogether." If American were to cease flying altogether, Section 20.4.6 of the Agreement would afford Plaintiff termination rights if the cessation of services rises to a certain level over the course of a full year. (Compl. Ex. A § 20.4.6.) Indeed, that provision makes perfect sense of the fact that the Agreement does *not* impose an obligation to fly continuously—American's cessation of service to Brazil would not be a breach of contract (as Section 6.8 makes clear), but Section 20.4.6 (the "Cessation of Services" provision) ensures that Plaintiff can terminate the Agreement. Notably, however, those termination rights are triggered only if American substantially decreases its flights relative to its competitors over the course of a full year, not if it temporarily ceases flights for a period of 90 days, which also makes perfect sense in the context of the long-term ten-year Agreement. (*See id.*).

Plaintiff argues that the "mere possibility that Section 20.4.5 and Section 20.4.6 might overlap in a narrow set of circumstances is no basis to not enforce Section 20.4.5 when it plainly applies, as here." (Opp. 16.) But that response misses the point. The problem for Plaintiff is that Section 20.4.5 does not "plainly apply" here—as even Plaintiff concedes, there is no "exact contractual language" requiring American to continuously fly to Brazil (Opp. 10). The question, then, is whether this Court should imply a contractual obligation to which the parties did not expressly agree. Plaintiff's main argument for doing so is that without it, American would simply be able to terminate flights to Brazil while leaving Plaintiff without recourse. But Section 20.4.6 makes clear that this is not so—the parties chose to address the possibility that American would reduce flight service by affording narrow termination rights instead of imposing

4

a more general contractual obligation—which belies Plaintiff's argument for implying a non-existent contractual obligation to fly continuously to Brazil.

Sections 20.4.6 and 6.8 are thus fatal to Count I. It is correct as a general matter that courts can imply contract terms where the parties omit them out of "sheer inadvertence or because they were too obvious to need expression." (Opp. 10 (quoting 11 Williston on Contracts § 31:7).) But courts cannot imply additional contractual obligations when, as here, "the contract contains an express provision that deals with the particular matter under consideration." 11 Williston on Contracts § 31:7 (4th ed. 2020); *see 2138747 Ontario, Inc. v. Samsung C&T Corp.*, 31 N.Y.3d 372, 381 (2018) ("[C]ourts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." (quotation omitted)). That is particularly true where, as here, the contract "was negotiated between sophisticated, counseled business people negotiating at arm's length." *2138747 Ontario, Inc.*, 31 N.Y.3d at 381. The fact that the parties expressly contemplated—and dealt with—the possibility that American might reduce or temporarily cease flight service to Brazil ends the matter.

### B. Plaintiff's Proposed Reading Would Make The Agreement Inadministrable.

Sections 6.8 and 20.4.6 are reason enough to reject Plaintiff's argument that American's failure to continuously fly to Brazil counts as a contract breach, but another reason is that Plaintiff's reading would make the Agreement impossible to administer. Plaintiff says that 90-day cessation of service to Brazil counts as a breach, but what about a 60-day cessation? What about 30 days? What about ten days, or one day? Under Plaintiff's theory, there is no reason whatever why ceasing flight service to Brazil is a breach of contract if it lasts for 90 days, but not if it lasts one day or 30 days. But that is the inescapable import of Plaintiff's position. After all, Section 20.4.1 of the Agreement allows Plaintiff to terminate if American fails to cure

5

a breach within 30 days. (*See* Compl. Ex. A § 20.4.1.) Yet Plaintiff apparently does not believe that American breached the Agreement after failing to fly to Brazil for 30 days because it has not invoked Section 20.4.1. And there is no plausible construction of the Agreement under which a 90-day cessation of service to Brazil is a breach of contract, but a 30-day cessation is not. Such a line-drawing exercise would be impossible. The parties, however, agreed to Section 6.8, which makes the exercise irrelevant: American made clear that it has assumed "no obligation" with respect to "flight activity," including "termination" of flights. (*Id.* § 6.8.) That clear contract language ends the matter, and requires dismissal of Count I.

## II.     Count II Fails To State A Claim.

Under the plain language of the Agreement, Plaintiff has also failed to plead its alternative claim that Plaintiff may terminate the Agreement under the frustration of purpose doctrine. (Mot. 13-15.) That doctrine applies only "where a virtually cataclysmic, wholly unforeseeable event renders the contract valueless to one party," *United States v. Gen. Douglas McArthur Senior Vill., Inc.*, 508 F.2d 377, 381 (2d Cir. 1974), and American's temporary cessation of U.S.-Brazil flights—far from wholly unforeseeable—was explicitly addressed by the parties.

### A.     The Parties Expressly Contemplated The Possibility That American Would Reduce Or Terminate Flights To Brazil.

Plaintiff contends that it does not matter if a reduction in U.S.-Brazil flights was foreseeable because non-foreseeability is not an absolute requirement of the doctrine. (Opp. 20.) Even assuming that is true (*but see Gen. Douglas MacArthur*, 508 F.2d at 381), here, the risk of American reducing or temporarily ceasing flight service to Brazil was not just *foreseeable*—the parties *actually foresaw* it. They drafted an express provision—the Cessation of Services provision in Section 20.4.6—dealing with that possibility by allowing Plaintiff to terminate the

6

Agreement if American's market share is reduced by a specified amount over an entire calendar year. (Compl. Ex. A § 20.4.6.) And the parties made clear that—outside of that Cessation of Services provision—American was making no "representation[s], warrant[ies], or covenant[s] . . . with respect to flight activity, including any suspension, reduction or termination of flights by an AA Carrier." (*Id.* § 6.8.) As even Plaintiff's cases show (Opp. 20), the frustration of purpose doctrine does not apply where, as here, the parties explicitly took into account—and contracted for—the possibility that the event at issue would occur. *See United States v. Winstar Corp.*, 518 U.S. 839, 907 (1996) ("[A]ny governmental contract that not only deals with regulatory change but allocates the risk of its occurrence will, by definition, fail … the impossibility defense, for it will indeed indicate that the parties' agreement was not meant to be rendered nugatory by a change in the regulatory law."); *see also Bank of Am. Nat'l Tr. & Sav. Ass'n v. Envases Venezolanos, S.A.*, 740 F. Supp. 260, 266 (S.D.N.Y. 1990) (frustration of purpose does not apply where the terms of the agreement explicitly take into account the possibility that the event would occur); *Warner v. Kaplan*, 71 A.D.3d 1, 6 (1st Dep't 2009) (death of apartment's purchaser not sufficient to warrant frustration of the sales contract where "the contract actually made explicit provision for the event of either party's death").

       Again, Plaintiff attempts to distinguish Sections 6.8 and 20.4.6, arguing that they concern altogether different contingencies—*viz.*, "strategic operational decision[s]" by American to reduce flights relative to its competitors or to reduce "the amount of flights" to Brazil. (Opp. 21.) Again, Plaintiff misses the point. Even if those provisions could be limited in the way Plaintiff suggests (and they cannot, *see supra* at 3-5), the important point for the frustration of purpose doctrine is that the parties contemplated the possibility that American might reduce or even terminate flights to Brazil—whatever the reason for that reduction or termination. The fact

7

that the parties foresaw that possibility and allocated risk according to the terms of the Agreement precludes a frustration of purpose argument.

### B. The Fact That The Parties Did Not Specifically Contemplate The Pandemic Does Not Warrant Application Of The Frustration Of Purpose Doctrine.

Plaintiff counters that this approach analyzes the issue at too high a level of generality. (Opp. 19.) In Plaintiff's view, the parties must have contemplated the pandemic itself—and not just the potential reduction in flights—for the risk to be foreseeable. That is wrong. What matters is not whether the parties anticipated the precise *reason* for, or effect of, the event at issue, but that they considered that an event like it might occur. In *A+E Television Networks v. Wish Factory Inc.*, 2016 WL 8136110 (S.D.N.Y. Mar. 11, 2016), for example, the defendant alleged that the purpose of the parties' agreement to license products associated with a television show was frustrated when one of the characters on the show made a series of disparaging remarks, leading retailers to cancel their orders of the show's products. *Id.* at *12. The defendant argued that the remarks—and the resulting order cancellations—were unforeseeable and so the doctrine should apply. The court rejected the defendant's argument, concluding that it "frames the question of foreseeability too narrowly." *Id.* at *14. "The [relevant] question," the court explained, "is not whether this specific event, the publication of [the character's offensive comments], nor this specific result, [the defendant's] alleged multi-million dollar losses, were foreseeable. Instead, it is sufficient to ask whether the parties contemplated a potential decline of the popularity of [the television show], or the profitability of the [p]roducts, and if so, whether and how they allocated that risk." *Id.*

Similarly here, the question is not whether this specific event—the COVID-19 pandemic—was foreseeable; it is whether the parties contemplated a possibility that flights to Brazil might be reduced or temporarily ceased (they did) and how they allocated that risk (via

8

Section 6.8 and the Cessation of Services provision). *See also Raner v. Goldberg*, 244 N.Y. 438, 442 (1927) (declining to apply frustration of purpose doctrine where parties understood that licensing decision was within discretion of a public officer and might be denied, even if they did not predict the reason for its denial).

The decades-old cases on which Plaintiff principally relies (Opp. 19-20)—*Goddard v. Ishikawajima-Harima Heavy Indus. Co.*, 29 A.D.2d 754 (1st Dep't 1968), and *Marks Realty Co. v. Hotel Hermitage Co.*, 170 A.D. 484 (2d Dep't 1915)—are not to the contrary. There was no suggestion in either of those cases that the risks at issue were foreseeable, let alone expressly contemplated by the parties. And even if those cases had considered foreseeability, their disposition would be perfectly consistent with the above analysis. In *Goddard*, the relevant question would be whether the parties contemplated the destruction of the boat factory, not whether the parties contemplated the fire that led to its destruction. And in *Marks*, the relevant question would be whether the parties contemplated that the yacht race would be canceled, not whether they contemplated that a World War would cause that cancellation.

*Kolodin v. Valenti*, 115 A.D.3d 197 (1st Dep't 2014), and *Jack Kelly Partners LLC v. Zegelstein*, 140 A.D.3d 79 (1st Dep't 2016) (Opp. 20), are also inapposite. In *Kolodin*, the contract was rescinded because a stipulation entered into by the parties "destroyed the means of performance" on the contract. 115 A.D. at 200. Here, there is no allegation that it would be impossible to continue performing the contract—indeed, Plaintiff indicated that it intended to continue performing its obligations under the Agreement in its termination letter to American. (Compl. Ex. B at 2.) In *Jack Kelly Partners*, it was the "inability to lawfully use the premises in [the] manner [contemplated in the contract] combined with defendants' alleged failure and refusal to correct the [certificate of occupancy]" that frustrated the purpose of a lease and entitled

9

the plaintiff to termination. 140 A.D at 85. Here, in contrast, American resumed flights to Brazil shortly after Plaintiff sent its termination notice on June 29, 2020 and thus has not failed to correct the frustrating circumstance. *See* David Shepardson & Tracy Rucinski, *American Airlines Soars 41% As Plan To Add July Flights Sparks Relief Rally*, Reuters (June 4, 2020).[2]

### C. Predictions About Future Flight Service Do Not Justify Application Of The Frustration Of Purpose Doctrine.

Finally, Plaintiff contends that it is not just the temporary cessation of flights that frustrated the purpose of the Agreement but the fact that the "COVID-19 pandemic will have a prolonged negative impact on international air travel." (Opp. 22.) A central assumption of the Agreement, Plaintiff contends, is that American will fly with greater frequency over time—that is why (in Plaintiff's view) the Agreement escalates the number of miles that Plaintiff must purchase over time. (*Id.* at 21-22.) But that is precisely the kind of market prediction that does not warrant application of the frustration of purpose doctrine. *See Bierer v. Glaze, Inc.*, 2006 WL 2882569, at *7 (E.D.N.Y. Oct. 6, 2006) ("Under New York law, changes in market conditions or economic hardship do not excuse performance."); *Health-Chem Corp. v. Baker*, 737 F. Supp. 770, 776 (S.D.N.Y. 1990) ("Quite a bit more is required than demonstrating a desire to avoid the consequences of a deal gone sour."). Otherwise, any party could escape liability whenever a contract becomes financially disadvantageous, "placing in jeopardy all commercial contracts." *Bank of Am. Nat'l Tr. & Sav. Ass'n*, 740 F. Supp. at 266 (quoting *407 E. 61st Garage Inc. v. Savoy Fifth Ave. Corp.*, 23 N.Y.2d 275, 282 (1968)).

### CONCLUSION

For these reasons, Plaintiff's Complaint should be dismissed with prejudice.

---

[2] https://www.reuters.com/article/us-health-coronavirus-american-airlines/american-airlines-soars-41-as-plan-to-add-july-flights-sparks-relief-rally-idUSKBN23B1YG.

10

Dated:  October 9, 2020

                                             Respectfully submitted,

                                             */s/ Mark W. Robertson*

Mark W. Robertson
mrobertson@omm.com
Anton Metlitsky
ametlitsky@omm.com
O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, NY  10036
Telephone:  (212) 326-2000
Facsimile:  (212) 326-2061

Anna Mohan (*pro hac vice*)
amohan@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC  20006
Telephone:  (202) 383-5300
Facsimile:  (202) 383-5414

***Attorneys for American Airlines, Inc.***

**CERTIFICATE OF SERVICE**

I hereby certify that on October 9, 2020, the foregoing document was filed with the Clerk of the Court and served via CM/ECF in accordance with the Federal Rules of Civil Procedure, and/or the Eastern District's Local Rules, and/or the Eastern District's Rules on Electronic Service upon the following parties and participants:

**Jacob Cohen**
Sullivan & Cromwell
125 Broad Street
New York, NY 10004
212-558-3262
Email: cohenja@sullcrom.com


**James Lawrence Bromley**
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
212-558-4923
Email: bromleyj@sullcrom.com


Dated: October 9, 2020                    */s/ Mark W. Robertson*

                                           Mark W. Robertson
                                           mrobertson@omm.com
                                           O'MELVENY & MYERS LLP
                                           Times Square Tower
                                           7 Times Square
                                           New York, NY 10036
                                           Telephone: (212) 326-2000
                                           Facsimile: (212) 326-2061

                                           ***Attorney for Defendant American***
                                           ***Airlines, Inc.***